No. 23-11163

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

JONATHAN SINGLETON,
on behalf of himself and those similarly situated,
*Plaintiff-Appellee*,

v.

HAL TAYLOR, in his official capacity as
Secretary of the Alabama Law Enforcement Agency,
*Defendant-Appellant*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
CASE NO. 2:20-cv-99-WKW-JTA

---

BRIEF FOR PROFESSOR WILLIAM P. QUIGLEY AS AMICUS CURIAE IN
SUPPORT OF PLAINTIFF-APPELLEE
URGING AFFIRMANCE

---

Joseph W. Mead
Shelby B. Calambokidis
Amy L. Marshak
*Institute for Constitutional Advocacy
and Protection*
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
(202) 662-9765
jm3468@georgetown.edu
sc2053@georgetown.edu
as3397@georgetown.edu

*Counsel for Amicus Curiae William
P. Quigley*

*Singleton v. Taylor*, No. 23-11163

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule

26.1-1, counsel certifies that William P. Quigley is interested in this case as amicus

curiae, and the Institute for Constitutional Advocacy and Protection, Shelby B.

Calambokidis, Amy L. Marshak, and Joseph W. Mead are interested in this case as

counsel for amicus. The Institute for Constitutional Advocacy and Protection is a

component of Georgetown University Law Center, a non-governmental corporation

which does not have a parent corporation and does not issue stock. Counsel for amicus is

unaware of any other person with an interest in the outcome of this case who is not

included in the list of interested persons contained in Defendant-Appellant's and

Plaintiff-Appellee's briefs.

*/s/ Joseph W. Mead*
Joseph W. Mead

*Counsel for Professor William P. Quigley*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ........................................................................C-1

TABLE OF CONTENTS............................................................................ i

TABLE OF AUTHORITIES ....................................................................... ii

INTEREST OF AMICUS CURIAE.............................................................1

STATEMENT OF ISSUES..........................................................................1

SUMMARY OF ARGUMENT ....................................................................1

ARGUMENT.................................................................................................4

I.     The State Has a Heavy Burden to Show that Begging Falls Outside the First
       Amendment's Protections. ..............................................................4

II.    The State Is Wrong that Begging Was Unprotected Expression Throughout
       History.............................................................................................9

       A.     During the Founding Era, Every State Assumed an Obligation to
              Provide Aid to People in Poverty. .....................................10

       B.     Vagrancy Laws Historically Sought to Prevent "Idleness" Through
              Forced Labor, Not to Restrict Speech. ..............................12

              1.     Compulsory Labor in the Nation's Early Years.......................13

              2.     Rejection and Attempted Resurrection of Compulsory
                     Servitude.................................................................20

III.   Changes in Circumstances and Constitutional Law Undercut the Historical
       Underpinnings of Vagrancy Laws................................................23

CONCLUSION .............................................................................................25

CERTIFICATE OF COMPLIANCE.......................................................26

CERTIFICATE OF SERVICE..................................................................27

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023)...............................................4

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ....................................................................4

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) ................................................5

*Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243 (1833) ........................................7

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) ..........................................5, 6, 8

*Burstyn v. Wilson*, 343 U.S. 495 (1952) ...................................................................7

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..............................................20, 22

*Cohen v. California*, 403 U.S. 15 (1971).................................................................7

*Counterman v. Colorado*, 143 S. Ct. 2106 (2023)...........................................2, 5, 8

*Edwards v. California*, 314 U.S. 160 (1941) ..........................................................24

*Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375 (1982) ....................22

*Gitlow v. New York*, 268 U.S. 652 (1925) ...............................................................4

Ledwith v. Roberts [1936] 3 All ER 570 (AC)........................................................14

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018)...............5, 6

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ...................................25

*Roth v. United States*, 354 U.S. 476 (1957)..........................................................6, 7

*Timbs v. Indiana*, 139 S. Ct. 682 (2019)....................................................20, 21, 24

*United States v. Alvarez*, 567 U.S. 709 (2012) .....................................................6, 8

*United States v. Kokinda*, 497 U.S. 720 (1990) ......................................................7

*United States v. Stevens*, 559 U.S. 460 (2010)............................................2, 5, 6, 8

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980) ...............7

## CONSTITUTIONAL PROVISIONS

S.C. Const. art. XXXVIII (1778) ..........................................................11

U.S. Const. amend. I ...........................................................................4

U.S. Const. amend. XIII.......................................................................20

## STATUTES AND LEGISLATION

1 Laws of the State of Delaware (New-Castle, Samuel & John Adams 1797).......11

1 The Laws of the State of Vermont, Digested and Compiled (Randolph, Sereno Wright 1808).....................................................................12

2 Laws of the Commonwealth of Massachusetts, November 28, 1780 to February 28, 1807 (Boston, J.T. Buckingham 1807) ...........................................11

2 Laws of the State of New-York, comprising the Constitution, and the Acts of the Legislature, Since the Revolution, from the First to the Fifteenth Session, Inclusive (New York, Thomas Greenleaf 1792) ..................................................18

A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use (Newbern, James Davis 1773) .................16, 19

A Digest of the Laws of South-Carolina, Containing the Public Statute Law of the State, Down to the Year 1822 (Benjamin James ed., 1822) ........ 11, 16, 17, 19

Act of Dec. 13, 1866, ch. 1,551, § 1, 1866 Fla. Laws 21 ......................................22

Act of Dec. 15, 1865, No. 107, 1865-1866 Ala. Laws 116 ....................................22

Act of Dec. 15, 1865, No. 112, § 2, 1865-1866 Ala. Laws 119 .............................22

Act of Dec. 21, 1865, No. 4733, 1864-1865 S.C. Acts 291 ............................22, 23

Act of Jan. 12, 1866, ch. 1,470, § 2, 1865 Fla. Laws 32 ......................................22

Act of Mar. 12, 1866, No. 240, 1865-1866 Ga. Laws 234....................................23

Act of May 4, 1812, ch. 75, § 6, 2 Stat. 721 ........................................................18

Act of Nov. 24, 1865, ch. 6, § 2, 1865 Miss. Laws 90..........................................21

Act of Nov. 25, 1865, ch. 4, § 5, 1865 Miss. Laws 82..........................................21

An Act for the Relief of the Poor, 1768 Md. Laws 486 (1768).................11, 12, 17

Digest of the Laws of the State of Alabama (John G. Aikin ed., 1833) ..................7

Digest of the Laws of the State of Georgia 1755-1800 (Horatio Marbury & William H. Crawford eds., 1802) ........................................................15

Statute of Laborers of 1349, 23 Edw. 3 (Eng.) ................................................14, 15

The Public Laws of the State of Rhode-Island and Providence Plantations (Providence, Carter & Wilkinson 1798) ..............................................17

## OTHER AUTHORITIES

Audrey Eccles, *Vagrancy in Law and Practice under the Old Poor Law* (2012)...19

Caleb Foote, *Vagrancy-Type Law and Its Administration*, 104 U. Pa. L. Rev. 603 (1956)....................................................................................13, 14

Commissioners for Inquiring into the Administration and Practical Operation of the Poor Laws, *Poor Law Commissioners' Report of 1834* (1834) ....................10

Daniel A. Novak, *The Wheel of Servitude: Black Forced Labor After Slavery* (1978) ........................................................................................21, 23

Eric Foner, *The Second Founding* (2019)........................................................13, 20

Glenn B. Manishin, Note, *Section 1981: Discriminatory Purpose or Disproportionate Impact?*, 80 Colum. L. Rev. 137 (1980) ................................22

Gregory A. Mark, *The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153 (1998) ......................................20

Marcus Wilson Jernegan, *The Development of Poor Relief in Colonial New England*, 5 Soc. Serv. Rev. 175 (1931) ............................................................12

Michael Kent Curtis, *The Curious History of Attempts to Suppress Antislavery Speech, Press, and Petition in 1835-37*, 89 Nw. U. L. Rev. 785 (1995) ..............8

Michelle Alexander, *The New Jim Crow* (rev. ed. 2012)................................22, 23

Paul Finkelman, *John Bingham and the Background to the Fourteenth Amendment*, 36 Akron L. Rev 671 (2003) ................................................13, 20, 23

*Proverbs* 21:13 (King James)...................................................................9

*Sturdy Beggar*, Oxford English Dictionary ...........................................16

Theodore Wilson, *Black Codes of the South* (1965) ...............................22

Tim Hitchcock, *The Streets: Literary Beggars and the Realities of Eighteenth-Century London*, *in* Cynthia Wall, *Concise Companions to Literature and Culture: A Concise Companion to the Restoration and Eighteenth Century* (2005) ..............................................................................................19

William Cohen, *Negro Involuntary Servitude in the South, 1865-1940: A Preliminary Analysis*, 42 J.S. Hist. 31 (1976)................................................21, 23

William J. Chambliss, *A Sociological Analysis of the Law of Vagrancy*, 12 Soc. Probs. 67 (1964)..................................................................................14

William P. Quigley, *Five Hundred Years of English Poor Laws, 1349-1834: Regulating the Working and Nonworking Poor*, 30 Akron L. Rev. 73 (1996) ...................................................................................................10, 14

*William P. Quigley, *Reluctant Charity: Poor Laws in the Original Thirteen States*, 31 U. Rich. L. Rev. 111 (1997)......................................................*passim*

Zachary R. Calo, *From Poor Relief to the Poorhouse: The Response to Poverty in Prince George's County, Maryland, 1710-1770*, 93 Md. Hist. Mag. 393 (1998) ................................................................................................19

## INTEREST OF AMICUS CURIAE[1]

Amicus curiae Professor William P. Quigley is professor emeritus at Loyola University School of Law, New Orleans. He is regarded as a premier scholar on the history of regulations of the poor since colonial times, including laws addressing begging. The State's brief cites Professor Quigley's scholarship; therefore, he has a strong interest in ensuring that it is characterized appropriately and, more broadly, that the Court is presented with an accurate description of vagrancy laws. Professor Quigley submits this brief in his individual capacity, not on behalf of any of the institutions with which he is associated.

## STATEMENT OF ISSUES

1. May the Court create a new category of unprotected speech based on vagrancy laws passed before the First Amendment applied to states?

2. Was begging considered unprotected speech during the nation's first century?

## SUMMARY OF ARGUMENT

The State argues that the Court should look to history, but it fails to heed history's lessons. Contrary to decades of Supreme Court and appellate case law, it argues that this Court should carve out an exception from the First Amendment's free-speech protections

---

[1] No party's counsel authored any part of this brief, and no party or person other than amicus or his counsel made any monetary contribution intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4)(E).

for expressions of need and requests for donations. It argues that this Court should do so based on Founding-era state statutes—laws that were enacted long before states were constrained by the First Amendment.

The State's First Amendment framework is wrong. Decades of judicial precedent emphasize that categories of unprotected speech are limited, and the Supreme Court has rejected every recent attempt to create a new exception. To create such an exception, the State must put forward persuasive evidence of a longstanding judicially recognized category of unprotected speech that is "'of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest' in [its] proscription." *Counterman v. Colorado*, 143 S. Ct. 2106, 2114 (2023) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

By arguing that the First Amendment can be resolved with a myopic focus on history, the State poses the wrong legal question. To make matters worse, it then gives the wrong answer to that question: Neither Founding-era poor laws nor Reconstruction-era vagrancy laws support the State's claim that begging has long been a category of unprotected expression.

During the Founding era, every state assumed an obligation to provide aid to those in poverty who were unable to work. Those who were able to work were required to do so in order to support themselves and their families. *See* William P. Quigley, *Reluctant Charity: Poor Laws in the Original Thirteen States*, 31 U. Rich. L. Rev. 111, 115 (1997)

[hereinafter "*Reluctant Charity*"]. The vagrancy laws that the State cites were concerned not with expression, but with idleness—being in poverty and lacking gainful employment. Vagrancy laws sometimes mentioned begging, but only because they considered an able-bodied person who survived by begging to violate the command that all people who could work should work. These laws often provided no punishment for a person found begging or otherwise believed to be living in "idleness" if they had gainful employment or could otherwise establish that they would not become a public charge that required poor aid.

Post-Civil War vagrancy laws were no more concerned with begging as speech than Founding-era poor laws. Rather, the driving force for the reinvigoration of vagrancy laws—adopted as part of Black Codes across the post-Civil War South—was to enact a new system of forced labor by formerly enslaved Black people.

Further, the pillars supporting the brutality of early American vagrancy regimes have long since crumbled. Localities no longer have a special obligation to provide aid to their residents in poverty who are unable to work. The conception of compelled labor that drove Founding-era vagrancy laws was rejected by the Thirteenth Amendment's prohibition on involuntary servitude. And the Fourteenth Amendment now requires that states follow the Bill of Rights, including the First Amendment, and rejects the premise that paupers lack the rights of other citizens. Indeed, vagrancy laws have been struck down by courts for decades.

If this Court were to adopt the State's argument that charitable solicitation falls outside the First Amendment, it would depart from longstanding Supreme Court precedent and be the first and only circuit to do so. Such a radical outcome requires the State to fully meet its burden of demonstrating that, among other things, expressions of need were always considered unprotected speech. Vagrancy laws that were more concerned with status and conduct than speech do not help its case.

## ARGUMENT

**I.    The State Has a Heavy Burden to Show that Begging Falls Outside the First Amendment's Protections.**

"[T]he freedom to think and speak is among our inalienable human rights." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2311 (2023). The First Amendment, made applicable to the States by the Fourteenth Amendment, *e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Because "[c]ontent-based prohibitions," like the State's anti-panhandling laws, "enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people," they are "presumed invalid" unless the government meets a heavy burden of defending their constitutionality. *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

The State's argument here is not that it has met its burden of defending its restrictions on speech; it is that the First Amendment does not apply in the first place. Thus, the State argues that there is a novel, previously unrecognized category of

speech—expressions of need—that falls "outside the reach of [the First] Amendment altogether . . . into a First Amendment Free Zone." *Stevens*, 559 U.S. at 469 (internal quotation marks omitted).

"From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 791 (2011) (internal alteration and quotation marks omitted). These limited areas "are long familiar to the bar and perhaps, too, the general public." *Counterman*, 143 S. Ct. at 2114 (internal quotation marks omitted). The State does not contend that begging falls into one of the existing recognized categories, but instead argues that this Court should discover a new category of historically unprotected speech. Although the Court has acknowledged the *possibility* that some historically unprotected but yet-to-be-identified categories of speech may exist, *see Stevens*, 559 U.S. at 472, it has not recognized a new category in decades. Instead, the Court "has been especially reluctant to exempt a category of speech from the normal prohibition on content-based restrictions." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA")*, 138 S. Ct. 2361, 2372 (2018) (internal alteration and quotation marks omitted). Thus, it has rejected recent requests to exempt from the First Amendment computer-generated child pornography, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); violent video games, *Brown*, 564 U.S. at 791; false statements

about one's military service, *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (plurality opinion); and depictions of animal cruelty, *Stevens*, 559 U.S. at 470.

The State faces a difficult burden to establish that a new category of unprotected speech should be added to the "few limited areas" already recognized. "[W]ithout persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the judgment of the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Brown*, 564 U.S. at 792 (internal alteration and quotation marks omitted).

To establish a new category, the State typically must show that the "Court's precedents . . . recognize such a tradition." *NIFLA*, 138 S. Ct. at 2372; *see also, e.g.*, *Alvarez*, 567 U.S. at 718 (plurality opinion) (noting that unprotected "categories have a historical foundation in *the Court's* free speech tradition" (emphasis added)). In those few instances where the Supreme Court has recognized a category of speech exempted from the First Amendment, it has pointed to longstanding *judicial* precedent that supported exempting such speech from constitutional protection. *See, e.g.*, *Roth v. United States*, 354 U.S. 476, 481 (1957) (recognizing obscenity as a category of unprotected speech based on "expressions found in numerous opinions indicat[ing] that this Court has always assumed that obscenity is not protected by the freedoms of speech and press"). Far from such precedent supporting the State's argument, the Supreme Court has

6

repeatedly and consistently recognized that requests for donations are protected speech. *E.g.*, *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion) ("Solicitation is a recognized form of speech protected by the First Amendment."); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (noting it is "clearly establish[ed] that charitable appeals for funds . . . are within the protection of the First Amendment").

Unlike longstanding judicial precedent, evidence that the states passed speech-restrictive laws in the nation's early years is not persuasive, as the states were not bound by the First Amendment until much later. *See Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 250-51 (1833) (holding Bill of Rights did not apply to the states). For example, all fourteen states in the Union by 1792 "made either blasphemy or profanity, or both, statutory crimes," *Roth*, 354 U.S. at 482, yet both are protected by the First Amendment under modern precedent, *Burstyn v. Wilson*, 343 U.S. 495 (1952); *Cohen v. California*, 403 U.S. 15 (1971). Thus, it is not surprising that alongside the statutory vagrancy provisions cited by the State, *see, e.g.*, Def.'s Br. 10, are any number of restrictions on First Amendment freedoms that no one would defend today. *E.g.*, Digest of the Laws of the State of Alabama 398 (John G. Aikin ed., 1833) (making it a crime punishable by whipping for "any slave or free person of color [to] preach to, exhort, or harangue any slave or slaves, unless in the presence of five respectable slave-holders"); *id.* 397 (making it a crime for "[a]ny person . . . to teach any free person of color, or slave, to spell, read, or write"); Michael Kent Curtis, *The Curious History of Attempts to Suppress Antislavery*

*Speech, Press, and Petition in 1835-37*, 89 Nw. U. L. Rev. 785, 802 (1995) (describing laws outlawing advocacy against slavery).

When applying the First Amendment, the Supreme Court has also carefully scrutinized governmental efforts to shoehorn modern laws into ancient constructs. Even when a modern law "mimics" language of an earlier statute, courts look closely to ensure that the modern sweep is not greater than the old boundaries of unprotected speech. *Brown*, 564 U.S. at 793 (rejecting attempt to deem violent video games obscene); *see also, e.g.*, *Alvarez*, 567 U.S. at 723 (plurality opinion) (distinguishing perjury and fraud from other false speech). Thus, the Court has rejected evidence that earlier generations prohibited certain conduct as giving license to restrict a new category of speech. *Stevens*, 559 U.S. at 469 (noting that although "the prohibition of animal cruelty itself has a long history in American law," there is no "similar tradition excluding *depictions* of animal cruelty from 'the freedom of speech'").

Moreover, even if early statutes were relevant to whether a category of speech warrants First Amendment protection, "history alone" has never been the guide for determining whether something falls outside the First Amendment. *Contra* Def.'s Br. 8. Instead, the Court considers whether "[those] historically unprotected categories of speech" are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in their proscription." *Counterman*, 143 S. Ct. at 2114 (internal quotation marks omitted). The State offers no

persuasive argument why expressions of need have slight social value. *Cf. Proverbs* 21:13 (King James) ("Whoso stoppeth his ears at the cry of the poor, he also shall cry himself, but shall not be heard.").

In sum, the State bears a heavy burden of adding a new "First Amendment free zone" to the "few limited areas" previously recognized by the courts. This burden is all the higher with generations of precedent stacked against its position. The State cannot meet this burden by simply invoking a few historical statutes.

## II.    The State Is Wrong that Begging Was Unprotected Expression Throughout History.

Not only does the State's novel reimagining of the First Amendment proceed under the wrong analytical framework, it also reaches the wrong conclusion based on the historical sources on which it seeks to rely. The State's attempt to turn begging into a newly discovered category of unprotected speech reveals a fundamental misunderstanding of what Founding-era poor laws provided and how those laws operated.

Although the State is correct in its unremarkable claim that states during the Founding era commonly adopted vagrancy laws as a response to poverty, *see* Def.'s Br. 12, these laws did not criminalize begging as speech. Instead, these laws reflected a common view of poverty and idleness: "relief of the poor was a local government responsibility; . . . poor people from other places were unwelcome; everyone who could work was forced to work; [and] poor relief was provided as cheaply as possible."

9

*Reluctant Charity*, *supra*, at 114. When understood through this lens, the vagrancy laws on which the State relies were part of an interconnected web of laws that regulated whom local governments had a responsibility to support and subjected those who could work to forced labor. They do not demonstrate a Founding-era judgment of the value of begging as speech and provide no basis to treat begging as unprotected speech now.

### A.    During the Founding Era, Every State Assumed an Obligation to Provide Aid to People in Poverty.

By the late eighteenth century, governments in both America and England alleviated the worst effects of poverty by providing basic aid to those unable to work, and imposing forced labor on those who were able to do so. Indeed, this had been the approach under English law for hundreds of years prior to the Founding. *See* William P. Quigley, *Five Hundred Years of English Poor Laws, 1349-1834: Regulating the Working and Nonworking Poor*, 30 Akron L. Rev. 73, 101 (1996) [hereinafter "*Five Hundred Years*"]. An exhaustive official study of the development and practice of English poor laws up to 1834 concluded that aid to people in poverty was found "[i]n all extensive civilized societies," and that it would be "repugnant to the common sentiments of mankind" to allow people to starve. Commissioners for Inquiring into the Administration and Practical Operation of the Poor Laws, *Poor Law Commissioners' Report of 1834*, at 227 (1834).

Following the English tradition, every state during the Founding era assumed a duty to provide direct aid to the poor, primarily through a complex "settlement" system

where localities bore responsibility for providing for the needs of their settled residents. *E.g.*, 2 Laws of the Commonwealth of Massachusetts, November 28, 1780 to February 28, 1807, at 606 (Boston, J.T. Buckingham 1807)[2] ("That legal settlements in any town or district in this Commonwealth, shall be hereafter gained, so as to subject and oblige such town or district to relieve and support the persons gaining the same . . . ."); *Reluctant Charity*, *supra*, at 114, 141-50 (summarizing the laws in the original thirteen states). South Carolina even enshrined this obligation into its Constitution. S.C. Const. art. XXXVIII (1778) ("The poor shall be supported . . . ."). The responsible locality might provide those settled poor who qualified for aid with a stipend, housing, clothing, food, education, materials with which to work, legal counsel, and access to a physician, with the costs paid for by the locality. *E.g.*, 1 Laws of the State of Delaware 545 (New-Castle, Samuel & John Adams 1797) (providing the poor "proper houses and places" and a supply of "hemp, flax, thread and other materials"); An Act for the Relief of the Poor, 1768 Md. Laws 486, 490 (1768) (directing purchase of "sufficient Beds Bedding Working Tools Kitchen Utensils Cows Horses and other Necessaries"); A Digest of the Laws of South-Carolina, Containing the Public Statute Law of the State, Down to the Year 1822, at 337, 340 (Benjamin James ed., 1822) [hereinafter "South Carolina Laws"] (providing poor to be "relieved and educated" and "assigned . . . council for the

---

[2] Most of the laws cited in this brief are available on HeinOnline as part of its historical archive of state statutes and session laws.

prosecution" of any civil suits); 1 The Laws of the State of Vermont, Digested and Compiled 884 (Randolph, Sereno Wright 1808) (providing localities shall provide qualifying poor people "houses, nurses, physicians and surgeons").

Because of their assumed obligation to provide aid to settled residents, localities attempted to minimize their financial obligations by restricting who was allowed to settle in their jurisdiction. *Reluctant Charity*, *supra*, at 141-50; Marcus Wilson Jernegan, *The Development of Poor Relief in Colonial New England*, 5 Soc. Serv. Rev. 175 (1931). Individuals who were currently poor or were likely to become "chargeable" financial burdens to the local government were not welcome to settle in town, and they could be removed back to their last settlement. *E.g.*, 1768 Md. Laws at 492. And localities used a heavy hand to try to prevent those who had officially settled in their jurisdiction from descending into poverty. Connecticut, for example, instructed towns to "diligently inspect into the affairs and management of all persons in their town" to ensure that household finances were not being mismanaged. *Reluctant Charity*, *supra*, at 121 (internal quotation marks omitted).

## B. Vagrancy Laws Historically Sought to Prevent "Idleness" Through Forced Labor, Not to Restrict Speech.

In addition to directing local governments to provide direct aid to people in poverty if they were unable to work, many states punished those who were able to work but did not do so. "[U]nder the poor laws, refusal to work by the able-bodied was a crime." *Reluctant Charity*, *supra*, at 164. Thus, a vagrant was not simply someone who lived in

poverty, but rather "an idle person who [was] without visible means of support and who, although able to work, refuse[d] to do so." Caleb Foote, *Vagrancy-Type Law and Its Administration*, 104 U. Pa. L. Rev. 603, 609 (1956) (describing common law definition). Although the notion of compulsory labor was rejected by the Thirteenth Amendment, the post-Civil War South continued to exploit vagrancy laws to perpetuate forced labor of those who had recently been freed. *See* Paul Finkelman, *John Bingham and the Background to the Fourteenth Amendment*, 36 Akron L. Rev 671, 680-85 (2003); Eric Foner, *The Second Founding* 48 (2019).

Begging as speech was never the issue. Instead, states were concerned that those without gainful employment would not meet their tax obligations or ran the risk of becoming a public charge. Thus, not every vagrancy law even mentions begging, and those that do consider begging by someone who is able to work primarily as evidence of idleness—something that could be rebutted if the person showed they had gainful employment. And because the harm addressed by vagrancy laws was unemployment among the able-bodied, the common remedy was forced labor, something that had nothing to do with expression.

1.     <u>Compulsory Labor in the Nation's Early Years</u>

Compelled labor as a remedy for perceived-unjustified idleness dates back to the Statute of Laborers of 1349. At that time, the Bubonic Plague had decimated the working population of England, and the decline of feudalism severed the reliance of serf laborers

on their feudal lords, which together led to a massive upheaval in the labor market that spurred increased mobility among laborers and demands for higher wages. *Five Hundred Years*, *supra*, at 75-77, 83. "The vagrancy laws emerged in order to provide the powerful landowners with a ready supply of cheap labor." William J. Chambliss, *A Sociological Analysis of the Law of Vagrancy*, 12 Soc. Probs. 67, 77 (1964). The Statute of Laborers expressed concern that there was a "great Scarcity of Servants, [who] will not serve unless they may receive excessive Wages[] and some rather willing to beg in Idleness, than by Labour to get their Living." 23 Edw. 3 pmbl. (1349). Thus, the Statute provided "*(a)* settlement of the able-bodied in their own parish, and provision of work for them there; *(b)* relief of the aged and infirm, ie, those who could not work; *(c)* punishment of those of the able-bodied who would not work." Ledwith v. Roberts [1936] 3 All ER 570 (AC) at 593-94.

Under the Statute, "every able-bodied person without other means of support was required to work for wages fixed at the level preceding the Black Death; it was unlawful to accept more, or to refuse an offer of work," or to move to another community in hope of higher wages or better working conditions. Foote, *supra*, at 615. To further ensure that there was no option but to labor for a local landowner on whatever terms he may offer, the law prohibited providing aid to able-bodied "valiant beggars," who "as long as they may live of begging, do refuse to labour, giving themselves to Idleness and Vice,"

thereby ensuring that such beggars "may be compelled to labour for their necessary Living." 23 Edw. 3, c. 7.

Although hundreds of years had passed since the Black Death, states during the Founding era adopted similar vagrancy laws that punished idleness and compelled all able-bodied people to work, often for artificially low wages. *Reluctant Charity*, *supra*, at 119-40. In Georgia, for example, the legislature complained that there were "able-bodied men, capable of laboring for their support" yet whose "idle and disorderly life render[ed] themselves incapable of paying" their taxes. Digest of the Laws of the State of Georgia 1755-1800, at 568 (Horatio Marbury & William H. Crawford eds., 1802). Thus, Georgia decreed that "able-bodied persons, not having some visible property, or who do not follow some honest employment, sufficient for the support of themselves and for their families (if any), and who shall be found loitering and neglecting to labor for reasonable wages . . . shall be deemed and adjudged vagabonds." *Id*. at 569. A person "found . . . wandering, strolling, loitering about or misbehaving himself" could be charged as a vagabond, but would be acquitted if they had gainful employment or signed up for military service. *Id*. If not, they were put to forced labor for one year, with the wages earned applied towards supporting the worker's family and "paid to the [worker] himself." *Id.*

Georgia's law does not mention "begging" at all, but other states adopted similar laws that sometimes referred to begging as evidence of idleness. For example, like

Georgia, North Carolina's legislature complained about "divers[e] idle and disorderly Persons, having no visible Estates or Employments, and who are able to work" but nevertheless wander "from one County to another, neglecting to labour." A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use 172 (Newbern, James Davis 1773) [hereinafter "North Carolina Laws"]. By refusing to work, the state posited, these idle non-workers were "render[ed] . . . incapable of paying" their taxes. *See id*. Thus, the state commanded that "idle, vagrant, or dissolute Persons, wandering abroad, without betaking themselves to some lawful Employments, or honest Labour, or going about begging" would be returned to their home settlement. *Id.* Once home, the non-worker could either provide sufficient security that they would undertake "some lawful Calling, or honest Labour," or would be bound out to service for a year. *Id.*

Similarly, South Carolina targeted "sturdy beggars" and others who "le[d] idle and disorderly lives." South Carolina Laws, *supra*, at 415-16. A sturdy beggar was not simply anyone who solicited alms, but "an able-bodied man begging without cause, and often with violence." *Sturdy Beggar*, Oxford English Dictionary, https://www.oed.com/dictionary/beggar_n?tab=meaning_and_use#24250307. When placed on trial, the jury was required to "inquire in what manner, and by what means, the person accused gains his, or her, livelihood, and maintains his, or her, family." South Carolina Laws, *supra*, at 417. If the jury concluded that the person was unable to support

16

themself, their labor would be auctioned off to members of the public for a year. *Id.*; *see also, e.g.*, The Public Laws of the State of Rhode-Island and Providence Plantations 365 (Providence, Carter & Wilkinson 1798) (providing that "any idle vagrant person," such as "any person who shall attempt to procure a living by begging," could be put to work for a month).

Because of their obligation to provide poor aid to their settled residents, *see supra* Part II.A, localities were especially concerned with people who were idle during the day rather than working to support themselves, and took steps to ensure that their idleness did not put them on the path towards receiving public aid. Thus, for example, Rhode Island put to work "idle, indigent persons, as shall from time to time be found in the said town, who by their ill courses are likely to become a town charge[.]" *Reluctant Charity*, *supra*, at 156 (internal quotation marks omitted). Maryland's poor law noted the "continual Increase of the Poor within this Province is very great and exceedingly burthensome," and prescribed "Employment for them" as the answer. 1768 Md. Laws at 486. And, in a law emphasized by the State, *see* Def.'s Br. 6, Congress authorized the District of Columbia to demand assurances from "all vagrants, idle or disorderly persons," and all who "have no visible means of support, or are likely to become chargeable to the city as paupers, or are found begging or drunk in or about the streets, or loitering in or about tippling houses, or who can show no reasonable cause of business or employment in the city," that they would not become a financial burden on the District. Act of May 4, 1812,

ch. 75, § 6, 2 Stat. 721, 726. (The very next provision allowed the district "to prescribe the terms and conditions upon which free negroes, mulattoes and others, who can show no visible means of support, may reside in the city." *Id.*)

Thus, Founding-era vagrancy laws prohibited "idle" living—that is, they made it a crime to be poor and able to work, yet have no "honest" employment. As the State admits, several states' vagrancy laws did not address begging at all. Def.'s Br. 10 (acknowledging that only some states "specifically banned begging" in their vagrancy laws); Def.'s Br. App. (citing laws from Delaware, Georgia, Massachusetts, and Pennsylvania that do not address begging). And those that did mention begging did so as a means of enforcing broader restrictions on idleness by people in poverty.[3] For those living an idle life (such as living off of begging) but who were able to work, state vagrancy laws prescribed a punishment to fit the crime: forced labor.

Thus, it was not the expression of need that caused the harms identified by the states, but the idleness that begging evidenced. Through their vagrancy laws, states were

---

[3] Even those that mention begging do so only in limited ways. South Carolina's law spoke only of "sturdy beggars," while North Carolina dealt only with idle persons, including beggars, who traveled away from their home settlement. Similarly, New York's textual focus is on *conduct*—specific behavior of some beggars—rather than speech. *See* 2 Laws of the State of New-York, comprising the Constitution, and the Acts of the Legislature, Since the Revolution, from the First to the Fifteenth Session, Inclusive 52 (New York, Thomas Greenleaf 1792) (proscribing "all persons, who not having wherewith to maintain themselves, live idle without employment, and also all persons who go about from door to door, or place themselves in the streets, highways or passages, to beg in the cities or towns where they respectively dwell").

primarily concerned with unemployment's potential effect on the public budget. States like Georgia and North Carolina emphasized increasing the number of employed residents who were able to pay taxes, while the District of Columbia, Maryland, and others were concerned about reducing the number who would need poor aid.

Because expression was not the problem targeted by the states, having sufficient employment or financial means was often a total defense to charges of vagrancy, including begging. *See, e.g.*, North Carolina Laws, *supra*, at 172; South Carolina Laws, *supra*, at 415-17. Indeed, in the very examples cited by the State, *see, e.g.*, Def.'s Br. 6, 10 (citing laws from District of Columbia and Alabama, respectively), a person who was found begging or otherwise without employment would be let go if they established that they would not become a financial burden on the locality's poor relief system.

Tellingly, no jurisdiction to which the State has pointed outlawed all charitable solicitation, begging, or other expressions of need. In fact, people in need would frequently solicit aid from their friends and neighbors before seeking public poor relief. *E.g.*, Zachary R. Calo, *From Poor Relief to the Poorhouse: The Response to Poverty in Prince George's County, Maryland, 1710-1770*, 93 Md. Hist. Mag. 393, 403-05 (1998).[4]

---

[4] There is evidence that vagrancy laws were not always enforced in practice, especially against beggars. *E.g.*, Audrey Eccles, *Vagrancy in Law and Practice under the Old Poor Law* 52 (2012); *see also* Tim Hitchcock, *The Streets: Literary Beggars and the Realities of Eighteenth-Century London*, *in* Cynthia Wall, *Concise Companions to Literature and Culture: A Concise Companion to the Restoration and Eighteenth Century* (2005) (describing a study in 1803 that identified thousands of beggars in London).

And those who did not receive the aid they had hoped for through the public poor system would frequently solicit additional aid directly from the legislature, again without punishment. *See e.g.*, Gregory A. Mark, *The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153, 2181-83 (1998).

### 2. Rejection and Attempted Resurrection of Compulsory Servitude

Founding-era vagrancy laws reflect the then-widespread acceptance of compulsory labor in a time of slavery and indentured servitude. With the end of the Civil War and the adoption of the Thirteenth Amendment, the United States outlawed forced labor except as punishment for a crime. U.S. Const. amend. XIII. Yet even after slavery was formally abolished, Southern States again looked to vagrancy laws, as part of their Black Codes, as a mechanism to "subjugate newly freed slaves and maintain the prewar racial hierarchy." *Timbs v. Indiana*, 139 S. Ct. 682, 688 (2019); *see also* Finkelman, *supra*, at 681-85; Foner, *supra*, at 48. "Among these laws' provisions were draconian fines for violating broad proscriptions on 'vagrancy,'" and newly freed slaves who were unable to pay were often forced to perform involuntary labor. *Timbs*, 139 S. Ct. at 688-89; *see also id*. at 697-98 (Thomas, J., concurring in the judgment) (discussing vagrancy statutes); *City of Chicago v. Morales*, 527 U.S. 41, 54 n.20 (1999) (plurality opinion) ("[V]agrancy laws were used after the Civil War to keep former slaves in a state of quasi slavery.").

For example, in Mississippi—the first state to enact Black Codes—all adult "freedmen, free negroes and mulattoes" were required to enter into labor contracts by the

second Monday of January 1866 and annually thereafter. Act of Nov. 25, 1865, ch. 4, § 5, 1865 Miss. Laws 82, 83 (An Act to confer Civil Rights on Freedmen, and for other purposes). Those "with no lawful employment or business" were "deemed vagrants" and subject to a $50 fine and 10 days' imprisonment. Act of Nov. 24, 1865, ch. 6, § 2, 1865 Miss. Laws 90, 90 (An Act to Amend the Vagrant Laws of the State). If convicted and unable to pay, they were forcibly "hire[d] out" to whoever would pay the fine. *See id.* § 5, 1865 Miss. Laws at 92; *see also Timbs*, 139 S. Ct. at 697 (Thomas, J., concurring in the judgment) ("Those convicted had five days to pay or they would be arrested and leased to 'any person who will, for the shortest period of service, pay said fine and forfeiture and all costs.' Members of Congress criticized such laws 'for selling [Black] men into slavery in punishment of crimes of the slightest magnitude.'" (citations omitted)).[5]

Following Mississippi's lead, other Southern States soon adopted Black Codes, including reinvigorated vagrancy statutes. *See* William Cohen, *Negro Involuntary Servitude in the South, 1865-1940: A Preliminary Analysis*, 42 J.S. Hist. 31, 47 (1976) (explaining that "all the former Confederate states except Tennessee and Arkansas passed new vagrancy laws in 1865 or 1866" because such laws provided a "way of forcing blacks to sign labor agreements"); *see also* Daniel A. Novak, *The Wheel of Servitude: Black Forced Labor After Slavery* 2-8 (1978) (discussing laws in these nine states).

---

[5] In the same Act, Mississippi also imposed a tax on all freedmen and Black people in the state; failure to pay the tax was considered prima facie evidence of vagrancy. 1865 Miss. Laws at 92-93 (§§ 6-7).

Although most vagrancy laws were facially racially neutral,[6] "Congress plainly perceived all of them as consciously conceived methods of resurrecting the incidents of slavery." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 386-87 (1982); *see also* Michelle Alexander, *The New Jim Crow* 28 (rev. ed. 2012) ("Nine Southern States adopted vagrancy laws—which essentially made it a criminal offense not to work and were applied selectively to blacks . . . .").

In Alabama, for example, the state "broadened its vagrancy statute to include '"any runaway, stubborn servant or child"' and '"a laborer or servant who loiters away his time, or refuses to comply with any contract for a term of service without just cause."'" *Morales*, 527 U.S. at 54 n.20 (quoting Theodore Wilson, *Black Codes of the South* 76 (1965)); *accord* Act of Dec. 15, 1865, No. 107, 1865-1866 Ala. Laws 116 (An Act to amend Section 3794 of the Code, relating to vagrants); Act of Dec. 15, 1865, No. 112, § 2, 1865-1866 Ala. Laws 119, 119-20 (An Act concerning vagrants and vagrancy). And many defined "vagrant" to include any man not gainfully employed, which encompassed "virtually every [B]lack [person] in the postwar South." Glenn B. Manishin, Note, *Section 1981: Discriminatory Purpose or Disproportionate Impact?*, 80 Colum. L. Rev. 137, 158 (1980); *accord Gen. Bldg. Contractors Ass'n*, 458 U.S. at 410 n.2 (Marshall, J.,

---

[6] *But see* Act of Jan. 12, 1866, ch. 1,470, § 2, 1865 Fla. Laws 32, 32 (An Act in relation to Persons of Color) (later amended to apply to all persons, *see* Act of Dec. 13, 1866, ch. 1,551, § 1, 1866 Fla. Laws 21, 21-22); Act of Dec. 21, 1865, No. 4733, §§ 94, 96, 97, 1864-1865 S.C. Acts 291, 303-04 (An Act to establish and regulate domestic relations of persons of color, and to amend the law in relation to paupers and vagrancy).

dissenting) (noting the Black Codes "included vagrancy laws, which were vague and broad enough to encompass virtually all Negro adults"); *see also, e.g.*, Finkelman, *supra*, at 683 ("Georgia declared that all persons 'wandering or strolling about in idleness, who are able to work, and who have no property to support them' were to be considered vagrants." (quoting Act of Mar. 12, 1866, No. 240, 1865-1866 Ga. Laws 234 (An Act to alter and amend the 4435th Section of the Penal Code of Georgia)). Moreover, as in Mississippi, the vast majority provided for the "hiring out" of offenders, which kept formerly enslaved persons in a state of quasi-slavery. Cohen, *supra*, at 47; *see* Novak, *supra*, at 1-7; Finkelman, *supra*, at 681-85; Alexander, *supra*, at 28; *see, e.g.*, 1864-1865 S.C. Acts at 304 (§§ 96-98).

In sum, as they had during the Founding era, the post-Civil War Southern States looked to vagrancy laws to force people into labor. This time, the target of compulsory labor was Black people recently freed from slavery.

## III. Changes in Circumstances and Constitutional Law Undercut the Historical Underpinnings of Vagrancy Laws.

The State not only gets its history wrong, it also fails to appreciate the lessons from history. The cruelty of ancient vagrancy laws has largely been relegated to history's dustbin—for good reason. Each of the pillars that supported anti-vagrancy laws at earlier times have been destroyed through the centuries by changes in circumstances and in constitutional law.

Unlike the Founding era, localities today no longer have the primary responsibility to provide assistance to their settled residents facing poverty. *See supra* Part II.A. Today, the majority of public aid to those in poverty comes from the federal government. As the Supreme Court put it: "the theory of the Elizabethan poor laws no longer fits the facts" of modern life and cannot be used to justify archaic restrictions. *Edwards v. California*, 314 U.S. 160, 171, 174-77 (1941) (striking down, on interstate commerce grounds, law prohibiting the transportation of indigent people into a state).

The law has also changed. The justifications underpinning historical vagrancy laws—and indeed the laws themselves—have been deemed unconstitutional. Through the Thirteenth Amendment, the nation emphatically rejected the theory of involuntary servitude that undergirded laws modeled after the Statute of Laborers. And through the Fourteenth Amendment, it rejected the notion that there are classes of Americans without constitutional rights—thereby foreclosing the use of vagrancy of laws to "maintain . . . racial hierarchy," as attempted by Southern States in the wake of the Civil War, *Timbs*, 139 S. Ct. at 688. The Fourteenth Amendment further renders obsolete the State's statement that "paupers . . . forfeited all civil, political, and social rights" at the Founding. Def.'s Br. 12. And, of course, the First Amendment now applies to the states, something that was not true in the Founding era. *See supra* pp. 4, 7.

With such drastic changes in constitutional law and circumstances, it is not surprising that courts regularly find vagrancy laws and their progeny unconstitutional.

*E.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 161-62 (1972) (striking down the city's vagrancy ordinance that derived from English poor laws, noting that the conditions that spawned those laws no longer existed yet the "archaic . . . definitions of vagrants" remained); *see also* Pl.'s Br. 46-51 (collecting cases).

In sum, the State's argument depends on a misunderstanding of a moment in history that has long since been swept away. Even if precedent were not firmly stacked against the State's position, the First Amendment's robust protection of free speech is too important to be curtailed on such a record.

## CONCLUSION

For all of the foregoing reasons, this Court should affirm the district court's judgment in favor of Plaintiff-Appellee.

Dated:   September 13, 2023

Respectfully submitted,

*/s/ Joseph W. Mead*
Joseph W. Mead
Shelby B. Calambokidis
Amy L. Marshak
*Institute for Constitutional Advocacy and Protection*
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
(202) 662-9765
jm3468@georgetown.edu
sc2053@georgetown.edu
as3397@georgetown.edu

*Counsel for Amicus Curiae Professor William P. Quigley*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,497 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 13, 2023                 */s/ Joseph W. Mead*
                                        Joseph W. Mead

                                        *Counsel for Professor William P. Quigley*

26

## CERTIFICATE OF SERVICE

I certify that on September 13, 2023, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

*/s/ Joseph W. Mead*
Joseph W. Mead

*Counsel for Professor William P. Quigley*