No. 23-11163

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

JONATHAN SINGLETON,
*Plaintiff-Appellee*,

v.

HAL TAYLOR, in his official capacity as
Secretary of the Alabama Law Enforcement Agency,
*Defendant-Appellant*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama, Northern Division
Case No. 2:20-cv-99-WKW-JTA

## APPELLANT'S PETITION FOR REHEARING EN BANC

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
Robert M. Overing
  *Deputy Solicitor General*
Dylan Mauldin
  *Ass't Solicitor General*
James A. Davis
  *Deputy Attorney General*
Richard D. Mink
  *Assistant Attorney General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

April 22, 2025

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.    ACLU of Alabama

2.    Adams, Hon. Jerusha T.

3.    Alabama Appleseed Center for Law and Justice

4.    Alabama Arise

5.    Alabama Attorney General's Office

6.    Alabama Justice Initiative

7.    Alabama Law Enforcement Agency

8.    Anderson, Kirsten Noelle

9.    Bauman, Tristia Moana

10.    Calambokidis, Shelby B.

11.    City of Montgomery, Alabama

12.    Copeland Franco Screws & Gill, PA

13.    Cunningham, Derrick

14.    Davis, James William

15.    Degnan, Ellen Lee

16.    Duke Law School First Amendment Clinic

17.    Dunn, Chelsea

i

18.    Faulks, Latisha Gotel

19.    Gallion & Gallion, LLC

20.    Gallion, III, Thomas T.

21.    Harris, Andrew Reid

22.    Holliday, Shannon Lynn

23.    Holmes, Micki (deceased)

24.    Hudson, David L.

25.    Institute for Constitutional Advocacy & Protection, Georgetown University Law Center

26.    Karas, Angela

27.    Knight, Madeline

28.    LaCour Jr., Edmund G.

29.    Marshak, Amy

30.    Marshall, Randall Charles

31.    Marshall, Steve

32.    Mauldin, Dylan

33.    Mead, Joseph

34.    Miller Smith, LLC

35.    Miller, Tamika R.

36.    Mills, Wallace Damon

37.    Mink, Richard Dwayde

38.  Montgomery County Sheriff's Department

39.  National Homelessness Law Center

40.  Norins, Clare

41.  One Roof Continuum of Care

42.  Overing, Robert M.

43.  Potter, Clara Joyce

44.  Quigley, William P.

45.  Rhodes, Charles W.

46.  Safstrom, Jennifer

47.  Segall, Robert David

48.  Siegel, Jodi

49.  Singleton, Jonathan

50.  Southern Legal Counsel, Inc.

51.  Southern Methodist University Law School First Amendment Clinic

52.  Southern Poverty Law Center

53.  Stanton Foundation First Amendment Clinic, Vanderbilt Law School

54.  Taylor, Hal

55.  University of Georgia School of Law First Amendment Clinic

56.  University of Illinois Law School First Amendment Clinic

57.    University of Nebraska Law School First Amendment Clinic

58.    Vickery, Ricky (deceased)

59.    Walker, Constance Caldwell

60.    Watkins, Hon. William Keith

61.    Webb McNeill Walker, PC

62.    Weber, Jeremy Stone

63.    West, Micah

64.    Zampierin, Sara Michelle

Counsel for the Defendant-Appellant further certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted this 22nd Day of April, 2025.

/s/ Robert M. Overing
Robert M. Overing
*Counsel for Appellant,*
*Secretary Hal Taylor*

iv

## RULE 40(b) AND 11TH CIRCUIT RULE 35-5(c) STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance. Namely, is begging constitutionally protected speech? For too long, States and their subdivisions have been constrained by an interpretation of the First Amendment that could not be further from its original meaning. During the Founding Era, vagrancy was a crime in every single State and the District of Columbia. The first States routinely regulated and punished begging as such. They did not simultaneously create a constitutional right to beg by ratifying the Free Speech Clause.

Yet without once consulting this historical tradition, the Court declared in 1999 that "begging is speech entitled to First Amendment protection." *Smith v. City of Fort Lauderdale* 177 F.3d 954, 956 (11th Cir. 1999). Plaintiffs have defended that decision on the ground that "history must stay in the past." Doc. 41 at 51. But the Constitution means what it meant in the past. And while the doctrine has sometimes strayed from original meaning, "what counts as unprotected speech starts and ends with tradition." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024). Traditionally, begging was never considered to be protected speech, and the Court should take this case *en banc* to say so.

/s/ Robert M. Overing
Robert M. Overing
*Counsel for Appellant,*
*Secretary Hal Taylor*

v

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

RULE 40(b) AND 11TH CIRCUIT RULE 35-5(c) STATEMENT ..................... vii

TABLE OF AUTHORITIES ................................................................... vii

ISSUE....................................................................................... 1

STATEMENT ............................................................................... 2

REASONS FOR GRANTING INITIAL HEARING EN BANC ........................... 2

    I.    Whether a Form of Speech is Constitutionally Protected is a Question of Original Public Meaning........................... 6

    II.    Begging is Not Constitutionally Protected Speech. ............................ 9

CONCLUSION .......................................................................... 15

APPENDIX ............................................................................... 16

CERTIFICATE OF COMPLIANCE ..................................................... 18

CERTIFICATE OF SERVICE .......................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Beauharnais v. People of State of Ill.*,
343 U.S. 250 (1952)......................................................................3, 8

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011)......................................................................8, 9

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) .................................................................. 3, 8, 9

*Clatterbuck v. City of Charlottesville*,
708 F.3d 549 (4th Cir. 2013) ............................................................9

*Club Madonna Inc. v. City of Miami Beach*,
42 F.4th 1231 (11th Cir. 2022) .......................................................14

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022)......................................................................6, 9

*Gresham v. Peterson*,
225 F.3d 899 (7th Cir. 2000) ..........................................................10

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272, 1277 (11th Cir. 2024) ......................................... 2-3, 8

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022).................................................................. 5, 7, 9

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022).........................................................................6

*Kovacs v. Cooper*,
336 U.S. 77 (1949)...........................................................................9

*Loper v. N.Y.C. Police Dep't*,
802 F. Supp. 1029 (S.D.N.Y. 1992) .................................................5

*Loper v. N.Y.C. Police Dep't*,
999 F.2d 699 (2d Cir. 1993).........................................................5, 9

*N.Y. State Rifle & Pistol Ass'n, v. Bruen*,
597 U.S. 1 (2022).................................................................. 6, 7, 14

*Nat'l Rifle Ass'n v. Bondi*,
No. 21-12314 (11th Cir. 2025) ................................................. 3, 6, 7

*Near v. State of Minnesota ex rel. Olson*,
  283 U.S. 697 (1931)..................................................................................8

*New York v. Ferber*,
  458 U.S. 747 (1982)..................................................................................8

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972)..................................................................................5

*People v. Zimmerman*,
  19 Cal. Rptr. 2d 486 (Cal. App. Dep't Super. Ct. 1993) ......................................9

*Republican Party of Minnesota v. White*,
  536 U.S. 765 (2002)..................................................................................8

*Roth v. United States*,
  354 U.S. 476 (1957)................................................................................3, 8

*Schneider v. State of New Jersey, Town of Irvington*,
  308 U.S. 147 (1939)................................................................................10

*Smith v. City of Fort Lauderdale*,
  177 F.3d 954 (11th Cir. 1999) .......................................... v, 1, 4-5, 9, 14

*Speet v. Schuette*,
  726 F.3d 867 (6th Cir. 2013) ..................................................................9, 10

*United States v. Jimenez-Shilon*,
  34 F.4th 1042 (11th Cir. 2022) ............................................... 2, 7, 8-9

*United States v. Rahimi*,
  602 U.S. 680 (2024)................................................................................14

*United States v. Stevens*,
  559 U.S. 460 (2010)............................................................... 7, 8, 9

*Vidal v. Elster*,
  602 U.S. 286 (2024).............................................................. 3, 7-9

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980)............................................................... 9-10

*Young v. N.Y.C. Transit Auth.*,
  903 F.2d 146 (2d Cir. 1990)......................................................................9

viii

**Statutes**

Ala. Code §13A-11-9.............................................................................2, 14

Ala. Code §32-5A-216..........................................................................2, 14

23 & 24 THE COLONIAL AND STATE RECORDS OF NORTH CAROLINA
(Stephen B. Weeks ed., 1909).................................................................17

THE COLONIAL LAWS OF MASSACHUSETTS: REPRINTED FROM THE EDITION OF 1660,
WITH THE SUPPLEMENTS TO 1672 (William H. Whitmore ed., 1889) ..................16

A DIGEST OF THE LAWS OF NEW JERSEY (Lucius Q. C. Elmer ed., 1838) ..............17

A DIGEST OF THE LAWS OF SOUTH-CAROLINA, CONTAINING THE PUBLIC STATUTE
LAW OF THE STATE DOWN TO THE YEAR 1822 (Benjamin James ed., 1822) .........17

DIGEST OF THE LAWS OF THE STATE OF ALABAMA
(John Aikin ed., 1833) ........................................................... 4, 13, 14

DIGEST OF THE LAWS OF THE STATE OF GEORGIA
(Horatio Marbury & William H. Crawford eds., 1802).......................................16

23 Edw. 3, c. 1....................................................................................4, 11

THE FIRST LAWS OF THE STATE OF CONNECTICUT
(John D. Cushing ed., 1982) ..................................................................16

THE GENERAL LAWS AND LIBERTIES OF THE MASSACHUSETTS COLONY
(Edward Rawson ed. 1672) ...................................................................16

LAWS OF MARYLAND AT LARGE, WITH PROPER INDEXES
(Thomas Bacon & Frederick Calvert eds., 1765)...............................................16

5 LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS,
RESOLVES, VOTES, ETC. (Henry Harrison Metcalf ed., 1916)..............................17

5 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA
(Thomas McKean Thompson ed., 1803) ....................................................17

1 & 2 LAWS OF THE STATE OF DELAWARE (New Castle:
Samuel and John Adams 1797) ...............................................................16

2 LAWS OF THE STATE OF NEW YORK (Weed, Parsons & Co. 1886) ...................4, 17

1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED
(Randolph: Sereno Wright 1808)...............................................................17

THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE
PLANTATIONS (Carter and Wilkinson 1798) ......................................................17

Statute of Westminster 1494, 2 Hen. 7 ..................................................................11

2, 6, 10, & 12 THE STATUTES-AT-LARGE, BEING A COLLECTION OF ALL
THE LAWS OF VIRGINIA, 1619-1792  (W. Hening ed., 1809-1823)......... 13-13, 17

1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT
(Zephaniah Swift ed., 1795)..............................................................................16

2 U.S. Statutes at Large (1812) .........................................................................3, 16

## Other Authorities

James W. Ely Jr., *Poor Laws of the Post-Revolutionary South, 1776-1800*,
21 TULSA L. J. 1 (1985) .................................................................. 12, 13

Caleb Foote, *Vagrancy-Type Law and Its Administration*,
104 U. PA. L. REV. 603 (1956)................................................................11

J. L. Gillin, *Vagrancy and Begging*,
35 AM. J. SOCIOLOGY 424 (1929) ........................................................11

Forrest W. Lacey, *Vagrancy and Other Crimes of Personal Condition*,
66 HARVARD L. REV. 1203 (1953)................................................. 11, 12

David Montgomery, *Wage Labor, Bondage, and Citizenship in Nineteenth-Century
America*, 48 INT'L LAB. & WORKING-CLASS HIST. 6 (1995)........................ 13, 14

William P. Quigley, *Reluctant Charity: Poor Laws in the Original Thirteen States*,
31 U. RICH. L. REV. 111 (1997) ..................................................................4, 12

Arthur H. Sherry, *Vagrants, Rogues and Vagabonds. Old Concepts in Need of
Revision*, 48 CAL. L. REV. 557 (1960)...................................................... 10-11, 14

Amy Dru Stanley, *Beggars Can't Be Choosers: Compulsion and Contract in
Postbellum America*, 78 J. AM. HIST. 1265 (1992)..............................................12

**ISSUE**

What counts as protected speech under the First Amendment is a question of history and tradition. Yet the Eleventh Circuit held that "begging is speech entitled to First Amendment protection" without any reference to history or tradition. *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999). Under the "prior-panel-precedent rule," the panel in this case was "bound to follow" and "apply *Smith*" "even if [it was] convinced the prior panel reached the wrong result." Slip. Op. 13, 15 (cleaned up).

The Court should rehear this case *en banc* and overturn *Smith*. That decision relied entirely on a loose analogy to "charitable solicitation," which the Supreme Court has said can be protected speech. But there is a distinctive tradition of regulation that targets begging—a robust historical record of vagrancy laws stretching back to the Founding and Colonial America. This record is unambiguous: begging was *never* considered constitutionally protected speech; rather, it was often criminalized. Understanding the scope of the Free Speech Clause in light of history and tradition, as this Court must, Alabama's begging laws do not violate the Constitution.

1

## STATEMENT

Plaintiffs-Appellees are homeless residents of Montgomery, Alabama and a certified class of individuals who will "stand on a public street" in Alabama for the purpose of solicitation or "loiter, remain, or wander in a public place" in Alabama for the purpose of begging." DE84. Plaintiffs filed suit on February 12, 2020, seeking to enjoin enforcement of two Alabama statutes: Alabama Code §13A-11-9(a)(1) (prohibiting loitering "for the purpose of begging") and Alabama Code §32-5A-216(b) (prohibiting "stand[ing] on a highway for the purpose of soliciting … contributions"). The district court granted summary judgment for Plaintiffs, declared Alabama's begging laws "facially unconstitutional under the First Amendment," and permanently enjoined their enforcement. DE118. On April 8, 2025, this Court affirmed.

## REASONS FOR GRANTING INITIAL HEARING EN BANC

"Speech doctrine is famously complicated." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024). Some say it's "exhausting." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1054 (11th Cir. 2022) (Newsom, J., concurring). Much of the 20th-century caselaw is "choked with different variations of means-ends tests," which are both "judge-empowering" and "freedom-diluting." *Id.* at 1053-54. But above this shifting landscape, there are a few "fixed stars," *id.* at 1053, that "are beyond dispute," *Honeyfund.com*, 94 F.4th

2

of 1277. One of them is the rule that "what counts as unprotected speech starts and ends with tradition." *Id.*

The Supreme Court has long applied a history-and-tradition test to the First Amendment's threshold question. Defamation is unprotected because the power to prohibit it is "sanctioned by centuries of Anglo-American law." *Beauharnais v. People of State of Ill.*, 343 U.S. 250, 263 (1952). Obscenity is unprotected because it was "outside the protection intended" at "the time of the adoption of the First Amendment." *Roth v. United States*, 354 U.S. 476, 483 (1957). In recent years, the Court has increasingly turned to "history and tradition" to define "the scope of the First Amendment." *Vidal v. Elster*, 602 U.S. 286, 301 (2024); *accord City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022).

Sometimes, discerning the original meaning of a constitutional text can be challenging; reasonable minds applying the same test can reach different outcomes. *E.g.*, *Nat'l Rifle Ass'n v. Bondi*, No. 21-12314 (11th Cir. 2025) (en banc) (*NRA*). But here, the answer is easy. The historical tradition of laws proscribing begging is both ancient and unambiguous. No one saw the Free Speech Clause as an obstacle in 1812 when President Madison empowered Washington, D.C. to penalize "all vagrants, idle or disorderly persons" and anyone "found begging" in the city. 2 U.S. Statutes at Large 725-26 (1812).

3

Far from controversial, the District of Columbia's statute had analogues in *every State* that ratified the First Amendment. *See* Appendix; *see also* William P. Quigley, *Reluctant Charity: Poor Laws in the Original Thirteen States*, 31 U. RICH. L. REV. 111 (1997). Some States outlawed vagrancy generally, and others specifically banned begging. For instance, a 1788 New York statute punished "all persons who go about from door to door or place themselves in the streets, highways or passages, to beg in the cities and towns." 2 LAWS OF THE STATE OF NEW YORK 643-44 (Weed, Parsons & Co. 1886).

Alabama's vagrancy laws followed the Founding Era models almost verbatim. Days after achieving statehood in 1819, Alabama formally incorporated the City of Mobile and granted its mayor and aldermen the following powers:

> [T]o cause all vagrants, idle or disorderly persons, … and all such as have no visible means of support, or are likely to become chargeable to the city as paupers, or are found begging … or who can show no reasonable course of business or employment in the city; all who have no fixed place of residence, … to give security for their good behaviour … and to indemnify the city against any charge for their support; and in case of their refusal or inability to give such security, to cause them to be confined to labour … as often as may be necessary.

DIGEST OF THE LAWS OF THE STATE OF ALABAMA 786-87 (John Aikin ed., 1833). Not only were such measures ubiquitous at the Founding; they trace *at least* as far back as the Middle Ages and England's 1349 Statute of Labourers. *See* 23 Edw. 3.

Despite this well-documented history, the Court declared in a brief opinion that "begging is speech entitled to First Amendment protection." *Smith v. City of*

*Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999). The Supreme Court has never gone so far, but the panel found a Second Circuit opinion that also eschewed history for a rootless balancing test. *See Loper v. N.Y.C. Police Dep't*, 999 F.2d 699, 705 (2d Cir. 1993). There, the district court had traced New York's begging law not only to its 1788 analogue but also to Blackstone, Locke, and Ancient Greece. *Loper v. N.Y.C. Police Dep't*, 802 F. Supp. 1029, 1032 & nn. 7-8 (S.D.N.Y. 1992). Yet that pedigree played no role in the court's decision. *Id.* at 1036-38. For its part, the Supreme Court has held that certain vagrancy laws can violate due process, *see, e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), but it has never called begging "constitutionally protected speech."

That leaves the Eleventh Circuit free to reconsider *Smith*. If it does, the Court will find "little reason to think the First Amendment was designed or commonly understood to upend" begging laws. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 475 (2022). And this case is an ideal opportunity. *Smith* was dispositive for the panel, which explained that criticism of *Smith* would be "better directed to this Court sitting *en banc*." Slip. Op. 15. Secretary Taylor respectfully requests rehearing *en banc* to overrule *Smith*, vindicate the State's traditional police powers, and restore the original public meaning of the First Amendment.

5

**I.      Whether a Form of Speech is Constitutionally Protected is a Question of Original Public Meaning.**

**A.** In no uncertain terms, the Supreme Court has taught that originalism is the law of constitutional interpretation. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 510 (2022) ("[T]he Establishment Clause must be interpreted by reference to historical practices and understandings." (cleaned up)); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022) ("[G]uided by [] history and tradition … we must ask what the Fourteenth Amendment means." (emphasis omitted)); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022) ("Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment[.]"). And as this Court reiterated last month, if "the Supreme Court relies on sources from the Founding era to interpret the Bill of Rights, … we do too." *NRA*, No. 21-12314, Slip. Op. 13-14. There, what divided the *en banc* Court was not *whether* to apply the Constitution's original meaning, but *how*.

Of the Court's recent exegeses, *Bruen* best distilled the basic test. Rejecting any semblance of an "interest-balancing inquiry," the Court restated the *only* way to interpret and apply the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

597 U.S. at 23-24. But the Second Amendment is not unique. Honoring historical tradition is "how we protect other constitutional rights … and how we assess many other constitutional claims." *Id.* at 24; *accord NRA*, No. 21-12314, Slip. Op. 13. In a free-speech case, the test works the same way. The government can "carry [its] burden" to show that some expression "falls outside of the category of protected speech." *Bruen*, 597 U.S. at 24. How? With "*historical* evidence about the reach of the First Amendment's protections." *Id.* at 24-25 (quoting reference to "histor[y] and tradition[]" in *United States v. Stevens*, 559 U.S. 460, 468-71 (2010)).

**B.** While much of free-speech doctrine remains "choked" with amorphous balancing tests, the threshold question—whether a form of speech is protected—is answered by history alone. *Jimenez-Shilon*, 34 F.4th at 1053-54 (Newsom, J., concurring). In *Houston Community College System*, for instance, the Supreme Court considered whether "the founding generation understood the First Amendment to prohibit representative bodies from censuring [their] members." 595 U.S. at 482. Because the power was "more or less assumed" at the Founding and "no evidence suggest[ed] prior generations thought [otherwise]," the case was over. *Id.* at 475-76. The Court reasoned first from "long settled and established practice"; it invoked doctrine only to "confirm" its conclusion. *Id.*

Even a law's "content-based distinctions" can survive if they "have always coexisted with the First Amendment." *Elster*, 602 U.S. at 295. The Court

7

confirmed in *Elster* that "heightened scrutiny need not always apply" when "history and tradition" place certain speech outside "the scope of the First Amendment." *Id.* at 299, 301 (citing *City of Austin*, 596 U.S. at 75; *R.A.V. v. St. Paul*, 505 U.S. 377, 382-83 (1992); *Roth*, 354 U.S. at 482-83.

By now, it is therefore "beyond dispute" that "what counts as unprotected speech starts and ends with tradition." *Honeyfund.com*, 94 F.4th at 1277; Some speech is not protected today because it never was. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 761-62 (1982) (child pornography); *Roth*, 354 U.S. at 483 (obscenity); *Beauharnais*, 343 U.S. at 263 (libel). Conversely, some speech is protected today because it was never restricted. *See, e.g.*, *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 795 n.3 (2011) (violent video games) (citing "absence of any historical warrant"); *Stevens*, 559 U.S. at 469 (depictions of animal cruelty) (no "long history" or "similar tradition" of restriction); *Republican Party of Minnesota v. White*, 536 U.S. 765, 785 (2002) (judicial campaign speech) ("neither long nor universal" "practice of prohibiti[on]"); *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 718 (1931) (reporting on official malfeasance) ("one hundred and fifty years" without such "restraints").

No multi-factor formula or fancy balancing test can explain why some speech is protected and other speech is not. And that makes perfect sense because *history is the test*. "Full stop." *Jimenez-Shilon*, 34 F.4th at 1053 (Newsom, J.,

concurring). Reducing free speech to a "mechanical jurisprudence" or "oversimplified formulas" "treat[s] society as though it consisted of bloodless categories." *Kovacs v. Cooper*, 336 U.S. 77, 96 (1949) (Frankfurter, J., concurring). That may have been permitted in the 20th century, but courts today have the benefit of *Elster*, *City of Austin*, *Houston Community College*, *Brown*, and *Stevens*—all of which teach originalism. Thus, courts may find "categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." *Stevens*, 559 U.S. at 472.

## II.    Begging is Not Constitutionally Protected Speech.

Not only was begging unprotected at the Founding; it was a crime. *Cf. Dobbs*, 597 U.S. at 217. That fact is undeniable and decisive, yet ignored by modern courts. Instead, almost every court to consider the First Amendment issue has wrongly reasoned by analogy, not history.

Silent on the historical record, *Smith v. Fort Lauderdale* asserted, "Like other charitable solicitation, begging is speech entitled to First Amendment protection." 177 F.3d at 956; *accord Speet v. Schuette*, 726 F.3d 867, 874-76 (6th Cir. 2013); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013); *Loper*, 999 F.2d at 705; *but see Young v. N.Y.C. Transit Auth.*, 903 F.2d 146, 154 (2d Cir. 1990); *People v. Zimmerman*, 19 Cal. Rptr. 2d 486, 488 (Cal. App. Dep't Super. Ct. 1993). Even on its own terms, *Smith* was wrong. In

9

*Schaumberg*, the key "charitable solicitation" case, the Supreme Court relied on "speech interests" like "the dissemination and propagation of views and ideas, and the advocacy of causes." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). "Canvassers in such contexts are necessarily more than solicitors for money." *Id.*; *see also Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 163, (1939) (contrasting restrictions "on political, social or economic" speech with "merely the common type of ordinance" about "hawkers, or peddlers"). Decades later, the Supreme Court still "has not resolved directly the constitutional limitations on [panhandling] laws." *Gresham v. Peterson*, 225 F.3d 899, 903 (7th Cir. 2000); *accord Speet*, 726 F.3d at 875-76. Absent precedent, courts should turn to history, which has never treated begging like the speech of "organized charities, not-for-profits, and political groups," *id.*

Faithful to text, history, and tradition, this Court should chart a new path to the old way of doing things. A decision in this vein could start and end with Founding Era vagrancy statutes. Or it could unearth Western tradition dating to medieval England. What the Court would find is an unbroken lineage of laws that imply the First Amendment was never understood—not at the Founding nor Reconstruction—to protect begging.

Scholars often identify King Edward III's Ordinance of Labourers in 1349 as the origin of modern vagrancy laws. *See, e.g.*, Arthur H. Sherry, *Vagrants, Rogues*

10

*and Vagabonds. Old Concepts in Need of Revision*, 48 CAL. L. REV. 557, 559 (1960); Caleb Foote, *Vagrancy-Type Law and Its Administration*, 104 U. PA. L. REV. 603, 615-17 (1956); J. L. Gillin, *Vagrancy and Begging*, 35 AM. J. SOCIOLOGY 424, 426 (1929). As feudalism declined, peasants were no longer tied to the land. English towns increasingly dealt with wandering foreigners, whom they worried could pose a nuisance or an economic liability. Foote, *supra* at 615; Forrest W. Lacey, *Vagrancy and Other Crimes of Personal Condition*, 66 HARVARD L. REV. 1203, 1206 (1953). Public demand, coupled with labor shocks and dislocation in the wake of the Black Death, led Edward III to enact the first ordinance on vagrancy, decreeing that "every man and woman of our realm" must work. 23 Edw. 3, c. 1. As the problems persisted into the 1400s, the poor laws became more complicated and more severe. In 1494, King Henry VII "provided that beggars and idle persons, after appropriate punishment in the stocks, were to be put out of town and directed to return to their homes, there to remain upon pain of further punishment should they return." Sherry, *supra* at 559 (citing Statute of Westminster 1494, 2 Hen. 7, c. 2). By and large, these provisions became "standard" and remained the law of England for several centuries. *Id.*

The American tradition hewed to the English. To guard the public from various types of disorder, the colonies adopted vagrancy laws similar or even identical to those of their English predecessors. *See, e.g.*, 2 THE STATUTES-AT-

LARGE, BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, 1619-1792, at 298 (W. Hening ed., 1809-1823) (citing "the wisdom of severall parliaments of England"). By the Founding Era, *every State had vagrancy laws*, which were "direct descendants of similar colonial and English poor law statutes." Quigley, *supra* at 164; *see also* Amy Dru Stanley, *Beggars Can't Be Choosers: Compulsion and Contract in Postbellum America*, 78 J. AM. HIST. 1265, 1266-67 (1992) ("Along with other English laws, these rules passed into colonial legal codes, and versions of them remained on the statute books of the American states."); Lacey, *supra* at 1206 (similar). The early States "feared that, unless checked, the unemployed and unruly would overwhelm the industrious." James W. Ely Jr., *Poor Laws of the Post-Revolutionary South, 1776-1800*, 21 TULSA L. J. 1, 20 (1985). Thus, local governments had wide discretion to fashion punishments and remedies for begging, idleness, wandering, and other threats to general welfare. Needless to say, there is no historical evidence that the founding generation protected the right of beggars and vagrants to beg. They were considered "paupers, and as such they forfeited all civil, political, and social rights." Quigley, *supra* at 160; *see, e.g.*, 10 LAWS OF VIRGINIA, *supra* at 130.

While authorizing harsh penalties, early "poor laws" were not just about law and order. England and the States sensibly understood vagrancy laws and poverty relief as two sides of the same coin. *See* Ely, *supra* at 2 ("By the eighteenth century

12

the poor laws of England had evolved into a complex code designed both to relieve indigents and to control their behavior."); *id.* at 20-22. The first States rapidly adopted laws to care for the poor, especially where Anglican parish vestries had served that function. Ely, *supra* at 4; *see, e.g.*, 12 LAWS OF VIRGINIA, *supra* at 573-80 (1787) (requiring towns "provide for and maintain the poor").

Likewise, while Alabama prohibited begging in the streets, the State also passed an 1823 act "for the support of the poor in each county," which raised taxes, created a fund, and appointed "overseers of the poor." DIGEST OF THE LAWS, *supra* at 340-43. By statute, "the indigent, lame, blind, and others, not able to maintain themselves" could receive housing, healthcare, and employment—all paid for by the county. *Id*. at 340. Because a person could become "chargeable" to the State, vagrancy laws functioned to distinguish those unwilling to contribute to society from those unable to do so.

By all accounts, the Founding-Era practice had not changed by 1866 when the Fourteenth Amendment incorporated the First Amendment against the States. If anything, punishments for vagrancy *increased* during the 1850s. *See* David Montgomery, *Wage Labor, Bondage, and Citizenship in Nineteenth-Century America*, 48 INT'L LAB. & WORKING-CLASS HIST. 6, 19 (1995). Despite State laws already on the books, a conference of public charities in 1877 "agreed that new, uniform state legislation was needed to prevent people from begging." *Id.* In

13

Reconstruction as well, vagrancy law and poor relief worked together "to secure that those who had no employer were at least subject to the supervision of police and of philanthropic institutions." *Id.* at 24.

The history reveals an unbroken chain over the entire period from Tudor England and colonial America through the Founding and Reconstruction. Although more lenient, many state laws still reflect that tradition today. *See, e.g.*, Sherry, *supra* at 560 (comparing English law and that of 20th-century Alabama). In 1823, Alabama could punish anyone "found begging … in and about the streets." DIGEST OF THE LAWS, *supra* at 786-87. And now, Alabama bans loitering "for the purpose of begging," Ala. Code §13A-11-9(a)(1), and "stand[ing] on a highway" to beg, Ala. Code §32-5A-216(b). Today's law is a "dead ringer for historical precursors," easily passing muster where the government needs only "a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30; *accord United States v. Rahimi*, 602 U.S. 680, 692 (2024).

If history was not the test when the Eleventh Circuit decided *Smith*, it undoubtedly is the test today. Because the Founding Era deemed begging to be criminal, not protected speech, this Court should overturn *Smith* and restore to the States their traditional police power to prohibit begging. "Here's hoping for a return to first principles." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1263 (11th Cir. 2022) (Newsom, J., concurring).

14

## CONCLUSION

The Court should grant the petition for rehearing *en banc*.

# APPENDIX
## Colonial and Founding Era Laws

| Jurisdiction | Citations |
|---|---|
| Connecticut | THE FIRST LAWS OF THE STATE OF CONNECTICUT 206-10 (John D. Cushing ed., 1982) (1784) (penalizing "vagabond, idle, and dissolute persons, begging")<br><br>1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 127 (Zephaniah Swift ed., 1795) (authorizing arrest of "vagrant persons") |
| Delaware | 1 LAWS OF THE STATE OF DELAWARE 167-70 (New-Castle: Samuel and John Adams 1797) (prohibiting importation of "vagrant persons" and providing for their removal)<br><br>*Id.* at 135-38 (distinguishing "pedlars, hawkers or petty chapmen" from "idle and vagrant persons")<br><br>2 LAWS OF THE STATE OF DELAWARE, *supra* at 1034-41 (authorizing removal to poor-houses) |
| District of Columbia | 2 U.S. Statutes at Large 725-26 (1812) (empowering Washington to penalize "all vagrants, idle or disorderly persons, all persons … found begging") |
| Georgia | DIGEST OF THE LAWS OF THE STATE OF GEORGIA 1755—1800, at 568-69 (Horatio Marbury & William H. Crawford eds., 1802) (1788) (penalizing "vagabonds" and "other idle vagrants or disorderly persons") |
| Maryland | LAWS OF MARYLAND AT LARGE, WITH PROPER INDEXES ch. XXIX, §§ IV-XVIII (Thomas Bacon & Frederick Calvert eds., 1765) (1768) (authorizing work-houses for "punishing Vagrants, Beggars, [and] Vagabonds") |
| Massachusetts | THE COLONIAL LAWS OF MASSACHUSETTS: REPRINTED FROM THE EDITION OF 1660, WITH THE SUPPLEMENTS TO 1672, at 211 (William H. Whitmore ed., 1889) (authorizing arrest of "Vagrant persons"); *id.* at 221 (penalizing those living "the Vagrant and Vagabond life")<br><br>THE GENERAL LAWS AND LIBERTIES OF THE MASSACHUSETTS COLONY 31 (Edward Rawson ed. 1672) (similar) |

16

| New Hampshire | 5 LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS, RESOLVES, VOTES, ETC. 691 (Henry Harrison Metcalf ed., 1916) (1791) (penalizing "Common-beggars") |
|---|---|
| New Jersey | A DIGEST OF THE LAWS OF NEW JERSEY 585-86 (Lucius Q. C. Elmer ed., 1838) (1799) (penalizing "disorderly persons" who "go about from door to door, or place themselves in streets, highways or passages, to beg") |
| New York | 2 LAWS OF THE STATE OF NEW YORK 643-44 (Weed, Parsons & Co. 1886) (similar) |
| North Carolina | 23 THE COLONIAL AND STATE RECORDS OF NORTH CAROLINA 435-36 (Stephen B. Weeks ed., 1909) (1755) (penalizing those "going about begging")<br><br>24 THE COLONIAL AND STATE RECORDS OF NORTH CAROLINA, *supra* at 597-98 (1784) (penalizing "vagrant[s]") |
| Pennsylvania | 5 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA 528-29 (Thomas McKean Thompson ed., 1803) (prohibiting the importation of "vagrant persons") |
| Rhode Island | THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 364-65 (Carter and Wilkinson 1798) (1798) (authorizing work-houses for the commitment of "any person who shall attempt to procure a living by begging in the streets") |
| South Carolina | A DIGEST OF THE LAWS OF SOUTH-CAROLINA, CONTAINING THE PUBLIC STATUTE LAW OF THE STATE DOWN TO THE YEAR 1822, at 166 (Benjamin James ed., 1822) (penalizing unlicensed "hawker[s]" and "pedlar[s]" as "common vagrant[s]"); *id.* at 415-18 (penalizing "vagrants" including "sturdy beggars") |
| Vermont | 1 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED 389 (Randolph: Sereno Wright 1808) (1797) (authorizing work-houses to "correct[]" "common beggars") |
| Virginia | 2 THE STATUTES-AT-LARGE, BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, 1619-1792, at 298 (W. Hening ed., 1809-1823) (1672) (adopting English vagrancy laws)<br><br>6 LAWS OF VIRGINIA, *supra* at 29 (1748) (penalizing "vagabonds," including any "found … begging") |

17

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume, typeface, and style requirements set forth in Fed. R. App. P. 40(d)(3) and 32(a)(5)-(6). This brief contains 3889 words, excluding the parts exempted under Fed. R. App. P. 32(f). It has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Robert M. Overing*
Robert M. Overing
*Counsel for Appellant,*
*Secretary Hal Taylor*

18

## CERTIFICATE OF SERVICE

I certify that on April 22, 2025, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

/s/ Robert M. Overing
Robert M. Overing
*Counsel for Appellant,*
*Secretary Hal Taylor*